UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,                        Criminal No. 21-cr-20461

v.                                  Hon. Linda V. Parker

Dion Davis,

        Defendant.

_____/

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

The prosecution of Dion Davis may have saved his life. When federal agents arrested Davis (aka "56 Dion"), he was deeply involved in a gang war that had already claimed the lives of his sister and her friend. And, just months before his arrest, a rival gang member shot up Davis's mother's house while his mother and five-year-old sister were inside. But Davis is not simply a victim of circumstance. Davis fanned the flames of this feud by participating in shootings, taunting and threatening rival gang members on social media, and continually flaunting his unfettered access to firearms.

In July 2021, law enforcement was looking for Davis to arrest him for illegally possessing a machine gun while on pretrial release and for unlawfully possessing ammunition he used to shoot a rival gang member at a gas station in Detroit. When agents found him, Davis fled. After a short chase, agents found that

1

Davis was in possession of yet another firearm. Because the facts of this case are serious, and because Davis's decision to carry and use firearms while on pretrial release for felony charges in two different counties demonstrates a lack of respect for the law, the United States asks the court to adopt the joint recommendation of the parties and sentence Davis at the top of the guidelines, followed by a three-year term of supervised release. Such a sentence would be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a)." *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008).

## I.  Background and Investigation and Procedural History

Dion Davis came to the attention of law enforcement because of his affiliation with the violent street gang 700 Gang. During the investigation into 700 Gang, officers found Davis—on pretrial release for felony firearms offenses and an unlawful user of controlled substances—in possession of a machine gun.

### a.  700 Gang (aka "Wax Gang" and "4GTMT")

The 700 Gang (aka "Wax Gang" and "4GTMT") is a violent Detroit street gang involved in several shootings, assaults, robberies, and illegal firearms possession between August 2018 and the present. "700 Gang" refers to Longview Street being the seventh street off Harper near the Ravendale neighborhood of Detroit. "Wax Gang" refers to and memorializes John Ford a.k.a. "Wax" who was associated with 700 Gang members and was killed in March 2019. 700 Gang

2

members also illegally carry, use, and possess firearms to protect themselves, other

700 members, and to intimidate members of rival gangs. Members commonly

utilize a variety of unifying marks and identifiers, including "gang signs," clothing,

and tattoos specific to the gang. Specifically, members and associates wear articles

of red clothing, and utilize the tags "4GTMT," "700 Gang," "Wax Gang," "Wax

World," and "3520s" to symbolize their gang affiliation.

Throughout the course of its investigation, law enforcement officers

reviewed recorded jail calls, social media posts, correspondence between 700 Gang

members on cell phones and social media, local police reports, and witness

statements.

Between August 2018 and December 2021, law enforcement recovered

more than 35 firearms in the possession of 700 Gang members. During the same

time period, twelve (12) 700 Gang members have been charged in felony cases for

robbery, assault with intent to murder, murder, carjacking, and firearms offenses.

Some of those cases stem from the following incidents:

> i. On April 8, 2020, Detroit Police attempted to stop a Ford
>
> Taurus driven by Davis for reckless driving. Davis fled from
>
> the officers, driving erratically and endangering others. Police
>
> stopped pursuing Davis because the chase became too
>
> dangerous for others on the road. But the officers recognized

Davis from prior encounters with him, and Davis was charged with felony fleeing and eluding as a result of his conduct. (PSR ¶ 45).

ii. On April 24, 2020, Detroit Police approached a vehicle parked on Longview Street (then 700 Gang territory) occupied by Davis and other 700 Gang members. As the officers walked up to the vehicle, the driver pulled away, striking one of the officers. Police pursued the vehicle on a high-speed chase into a residential neighborhood in Clinton Township, Michigan. The driver stopped the vehicle and everyone, including Davis, fled on foot. Officers found a firearm in the vehicle where Davis was sitting. Davis was arrested and charged with carrying a concealed weapon and resisting and obstructing police. (PSR ¶ 46).

iii. On July 11, 2020, Detroit Police attempted to stop a stolen Jeep Grand Cherokee. The driver of the Jeep fled at a high rate of speed and the officers did not pursue the vehicle. A short time later the officers located the Jeep Grand Cherokee in the driveway of a residence on Saratoga. The officers observed Davis standing on the front porch of the residence and noted

4

that he was shaking and was out of breath. The officers detained Davis and heard a chain link fence moving behind the garage. The officers went to that location and recovered an AK-47 semi-automatic rifle and a Glock 26, 9mm semi-automatic pistol equipped with a 30-round magazine. Inside the Jeep, the officers recovered medical paperwork and a Wayne County Jail inmate property receipt belonging to Davis along with a 9mm 50-round drum magazine. The Glock 26, 9mm pistol was test fired at the crime lab and the fired cartridge casings were entered into the National Integrated Ballistic Information Network (NIBIN) for comparison purposes. Based upon this analysis, the Glock 26, 9mm pistol was linked to nine separate crime scenes where shots were fired since October 2019. Specifically, fired cartridge casings from these crime scenes were determined to have likely been fired by the Glock 26, 9mm pistol recovered on July 11, 2020.

iv. On August 1, 2020, Detroit Police attempted to stop a Dodge Challenger driven by Davis (700 Gang) and occupied by Z.V.n (700 Gang). Davis pulled into a gas station parking lot and got out of the car. As police approached the car, Z.V. got into the

5

driver's seat and drove off. As Z.V. fled, he blew a red light and crashed into a Dodge Durango. The driver of the Durango was ejected from the vehicle and killed. Police caught up to Z.V., placed him under arrest, and searched the Challenger. During the search, police found two firearms in the car.

v. On August 22, 2020, Detroit Police officers responded to a residence on Albion Street on reports of a person with a weapon. When the officers arrived, they observed a crowd of people scatter from the yard, and several people—including 700 Gang members Davis and R.O.—running inside of the residence. Through a window one officer saw Davis and R.O. stuffing guns into a bedroom closet. Officers searched the house and yard and recovered a total of 12 firearms and a credit card embossing machine.

vi. On December 31, 2020, Las Vegas Police officers responded to a robbery call near Grandview Ridge and Blue Macaw in Las Vegas, Nevada. The victim reported he was in the area to sell marijuana to an individual later identified as Romello Johnson (700 Gang). When the victim arrived, Johnson got into the front passenger seat of the victim's vehicle while his co-conspirator

got into the rear driver's seat. Johnson pointed a firearm at the victim while the co-conspirator began choking the victim, trying to take his gold chain necklace. Johnson and the co-conspirator stole the victim's tan FN semi-automatic handgun out of the glovebox. On February 19, 2021, officers arrested Johnson at his residence in Las Vegas. Officers saw posts on Johnson's Instagram account "lilmello700" documenting his possession of the victim's firearm after the robbery and obtained a search warrant for that residence. During the search, officers recovered the victim's handgun inside of a toilet. R.O. was at the residence as well.

vii. On March 7, 2021, Detroit Police officers responded to the Exxon gas station on Mack Avenue in Detroit on reports of a shooting that had occurred. The officers reviewed video surveillance of the incident, which showed a white 2020 Jaguar F-Pace SUV parking at a gas pump and the driver of the vehicle exited while a black male, later identified as Davis remained in the front passenger seat. The victim walked out of the gas station, appeared to see Davis, and produced a black handgun, holding it at his side. Davis fired multiple shots at the victim—

through the front windshield of the Jaguar—striking him in the head and hip. Later, the victim—an "opp" or person in opposition to 700 Gang—identified Davis as the individual who shot at him and told police that the incident had to do with an earlier murder.

On June 23, 2020, shortly after 11 p.m., J.G. (aka "Tank")—a rival gang member—was murdered. He was shot multiple times while attending a candlelight vigil on Runyon and Greiner in Detroit, Michigan. Six fired handgun cartridge casings were found on the road near the victim and two fired rifle cartridge casings were found in the victim's vehicle. That same evening, at approximately 11:24 pm, Davis arrived at St. John's hospital in Detroit, approximately 5 miles from where the victim was shot. Davis had been shot behind his right ear. Davis stated that he had been at a block party when he was shot and described for the officers the location where he was allegedly shot at. Officers responded to the location given by Davis and found no evidence of a block party and found no evidence of a shooting.

On November 6, 2020, N.K. (aka "Chopstick")—another rival gang member—was murdered. He was shot multiple times while sitting in a car outside of a nightclub in Detroit, Michigan. There have not yet been any criminal charges issued as a result of either of these murders, but several 700 Gang members—

8

including Davis—boast about the killings in songs and on social media. (*See* Government's Exhibit 1, a screen recording of Davis' Instagram stories, uploaded to Youtube on September 12, 2021, available at https://www.youtube.com/shorts/kF5Zs0_ot58 "Chop dead as hell, boy you better pick it up. Put that n**** Chop down. He dead, they had to dig him up."). And, in April 2021, Davis's girlfriend asked about his voicemail recording being "Chop got put down we smoking tank out the windowwww." *See*:

| **Author** | k▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
|---|---|
| **Sent** | 2021-04-28 04:26:29 UTC |
| **Body** | "Chop got put down we smoking tank out the windowwww " that's yo voicemail? |

Violence between 700 Gang and its rivals escalated after the murder of N.K. (aka "Chopstick") in November 2020. On January 13, 2021, someone—believed by law enforcement to be a member of a gang feuding with 700 Gang—came to Davis's mother's house in Warren, Michigan looking for Davis. When Davis's mother told the suspect he could not come into her house, the suspect grabbed a gun from his waistband and began firing shots into the home. Davis's mother ran to protect her five-year-old daughter. Davis's mother told police that Davis had "ongoing beef" with several young men, and he had been shot "two or three times in the last two years." Nine days later, Davis's twin sister was murdered in Clinton Township, Michigan. On January 22, 2021, Davis's sister and her friend were

standing outside of a car with two minor children in the backseat. Two men approached Davis's sister and opened fire, killing Davis's sister and her friend. Both men have been arrested and charged with the homicides. Both men are believed by law enforcement to be rivals of the group 700 Gang.

Davis utilized his Instagram account to announce his intention to get revenge for his sister's murder. Specifically, Davis stated "I'm killing [n-words] ion kare if we at the police station" and "yo baby brotha got a timing [clock emoji and the clock ticking on these [n-words]." On February 11, 2021, officers with the Detroit Police Department were conducting surveillance on a funeral procession for Davis's sister due to the potential for violence. The officers observed Davis and another 700 Gang member exit a vehicle and run across the road. Davis was armed with an AK-47 style pistol while the other individual was armed with a firearm equipped with an extended magazine. Davis was brought back to his vehicle by other friends or family members and left the area before police intervened.

b. Dion Davis—a 700 Gang member—unlawfully kept firearms

i. *Dion Davis is a member of 700 Gang.*

Law enforcement has verified Davis's affiliation with the group 700 Gang. (PSR ¶ 52). In his Instagram account "56ongo," Davis explicitly advertises his allegiance with 700 Gang (aka "Wax Gang"). *See:*

10

 

In other posts, Davis uses hashtags #waxgang, #redsquad, #007waxgang to signify his affiliation to the group.

Davis is also featured heavily in other 700 Gang members' social media posts. *See* the following Facebook post from November 28, 2019 by R.O.:



L-R: Romello Johnson, C.S., R.O., Z.V. (top), D.J., and Dion Davis.

Also see the following Instagram post by Romello Johnson:



L-R: C.S., Romello Johnson, and Dion Davis.

12

ii. *Dion Davis has unfettered access to firearms*

Davis was arrested for illegally carrying a firearm in April 2020. He was arrested again on August 1, 2020 and officers found two more firearms in his vehicle. Two weeks later, Davis had another 12 firearms, all of which were seized by police on August 22, 2020. Then, in March 2021, he used a firearm to shoot a rival gang member at a gas station in Detroit. But, by the time he was arrested in April 2021, he had a different firearm, which law enforcement seized. And finally, during his July 2021 arrest in this case, federal agents found Davis in possession of yet another gun, which Davis told them he had acquired that day. Davis has proven time and again that when law enforcement takes his guns, he just goes out and gets more firepower.

Davis's Instagram profile is essentially a photo diary of his firearms. *See*:



*Davis's Instagram on 11/22/20*



*Davis's Instagram on 1/11/21*



*Davis's Instagram – 1/23/21*



*Davis Instagram 4/14/21*

14

On April 25, 2021, Davis posted a live video to his Instagram account associated with the username "56ongo." During the video, Davis was wearing green body armor while brandishing two Glock pistols. One of the pistols was equipped with a distinctive red aftermarket laser affixed to the accessory rail, an extended magazine, and a Glock conversion device (also known as a "Glock switch") affixed to the rear of the slide. *See*:



On April 30, 2021, members of the FBI Violent Gang Task Force executed a federal search warrant at a residence on Colorado Avenue in Highland Park. During entry, law enforcement encountered Davis and others inside of the residence. During the subsequent search, law enforcement recovered a Glock pistol with a distinct red aftermarket laser affixed to the accessory rail, an extended

magazine, and a Glock switch affixed to the rear of the slide. The characteristics of this firearm match those of the firearm possessed by Davis in the April 25, 2021 Instagram live video. The Glock firearm was test fired at the crime lab and was found to function as a fully automatic pistol.

Davis also utilized his Instagram account to sell and/or trade firearms to other individuals. On February 9, 2021, Davis utilized his Instagram account to have a conversation with another Instagram user. During this conversation, Davis asked the other individual "Wanna trade yo Glock for a fully Tech." Davis then sent a photograph of a firearm which appears to be the same firearm that Davis was holding in his January 11, 2021 Instagram post. On April 15, 2021, Davis utilized his Instagram account to have a conversation with another Instagram user. During this conversation, Davis offered to sell the other individual a ghost gun that resembled a Glock handgun for $1200. *See*:

**Author** 56ongo (Instagram: 44706498758) **(Davis's Account)**
**Sent** 2021-04-15 16:09:51 UTC
**Body** Yo

**Author** Prospective Buyer
**Sent** 2021-04-15 16:10:35 UTC
**Body** Let me buy that gun

**Author** 56ongo (Instagram: 44706498758)
**Sent** 2021-04-15 16:13:28 UTC
**Body** Which one the ghost

**Author** Prospective Buyer
**Sent** 2021-04-15 16:13:39 UTC
**Body** Yeah how much

**Author** 56ongo (Instagram: 44706498758)
**Sent** 2021-04-15 16:13:48 UTC
**Body** 1200

16

Just days before his arrest in this case, Davis live-streamed a video to Instagram showing him carrying a rifle in a vehicle. The following image is screenshot from the Instagram Live video posted by user "56baxkagain" on July 8, 2021.



On July 13, 2021, a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) was looking for Davis to arrest him on the federal criminal complaint in this case. The agent observed Davis enter the passenger seat of a Ford F-150. The ATF agent, being assisted by Dearborn Heights police

officers, followed the vehicle to a nearby car wash in Dearborn Heights. Law enforcement approached the vehicle and identified themselves as police officers. Davis exited the vehicle and walked briskly away from the officers, disobeying their lawful commands to stop. Davis continued to disregard the officers' orders as walked through the car wash, into a back office where he tossed a Glock 27, .40 caliber semi-automatic pistol. An employee of the business was sitting at a desk in the room where the defendant threw the gun. (*See* Government's Exhibit 2, a recording of surveillance video from the car wash). ATF Agents recovered the firearm, which was loaded with one round chambered and fourteen rounds in the magazine.

The United States charged Davis in a six-count indictment in July 2021. (PSR ¶ 1). On May 5, 2022, Davis pleaded guilty to five counts of illegal possession of a machine gun, unlawful user of controlled substances in possession of a firearm, and receipt of a firearm while under Indictment without a Rule 11 plea agreement. (PSR ¶ 9). The parties have filed a stipulation to dismiss count four of the indictment. (ECF No. 35).

## II. Sentencing Guidelines Calculation and Relevant 3553(a) Factors

### A.    The Sentencing Guidelines Range

Although advisory, the Sentencing Guidelines remain an important factor under Section 3553(a) in fashioning an appropriate sentence. As noted in *United*

18

*States v. Rita*, 551 U.S. 338, 345 (2007), "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."

Davis pleaded guilty without a written plea agreement. (PSR ¶ 9). The United States Probation Office calculated Davis's criminal history category to be II and offense level of 19, resulting in a sentencing guideline range of 33 to 41 months. (PSR ¶ 72). However, the government disagrees with probation's scoring of the offense level. The government believes that Davis should be assessed four points under USSG § 2K2.1(b)(6)(B) for possessing a firearm in connection with another felony offense and two points under USSG § 3C1.2 for reckless endangerment during flight. With the enhancements, Davis's offense level is 25, resulting in a sentencing guideline range of 63-78 months.

**B.     A four-level enhancement under USSG § 2K2.1(b)(6)(B) is appropriate**

Section 2K2.1(b)(6) of the Sentencing Guidelines provides that "[i]f the defendant used or possessed any firearm or ammunition in connection with another felony offense ... increase by four levels." U.S.S.G. § 2K2.1(b)(6). It is enough that the firearm had the potential to facilitate the other felony offense. U.S.S.G. § 2K2.1 app. n. 14(A). A "felony offense" is "any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment of a term exceeding one year, regardless of whether a criminal

charge was brought, or a conviction obtained." U.S.S.G. § 2K2.1 app. n. 14(C).

The Sixth Circuit has held that section 2K2.1(b)(6) requires the government to establish, by a preponderance of the evidence, a nexus between the firearm and an independent felony. *United States v. Burns*, 498 F.3d 578, 580 (6th Cir.2007) In other words, the government must prove that "the connection between the firearm and the other felony was not merely coincidental, that the firearm served some purpose in relation to the other offense, such as embolden[ing] the defendant in committing it." *United States v. Berkey*, 406 Fed.Appx. 938, 939 (6th Cir.2011). *See also United States v. Coleman*, 627 F.3d 205, 212 (6th Cir.2010) (holding that a firearm or ammunition facilitates the commission of a felony if it makes it "easier or less difficult," or if it serves "some emboldening role in a defendant's felonious conduct."). The firearm "need not be actively used" in the other offense. *United States v. Angel*, 576 F.3d 318, 320 (6th Cir.2009). The court has also recognized that "demonstrating this nexus is not a particularly onerous burden." *United States v. Davis*, 372 Fed.Appx. 628, 629 (6th Cir.2010).

Here, the "other felony" is resisting arrest under Michigan law, which states that "an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony." Mich. Comp. Laws § 750.81d(1). The act of obstructing an officer from performing his or her duties "includes the use or

20

threatened use of physical interference or force *or a knowing failure to comply with a lawful command*." *Id*. § 750.81d(7)(a) (emphasis added). *See also United States v. Mosley*, 575 F.3d 603, 607 (6th Cir.2009) (holding that Mich. Comp. Laws § 750.81(d)(1) contains "at least two categories" of violations, including violations "involving an individual who 'obstructs' an officer through 'a knowing failure to comply with a lawful command'").

When the ATF agent and officers encountered Davis in the parking lot of the car wash on July 13, 2021, they ordered him to stop. He did not. As Davis entered the car wash, the agent and officers ordered him to stop. He did not. As Davis headed towards the back office of the car wash and reached into his sweatshirt pocket the agent and officers ordered him to stop. He did not. Each of the commands given by the officers were lawful. Davis disregarded those commands, increasing the dangerousness of the situation. While disregarding the officers' many commands, Davis was armed with a firearm which facilitated his obstruction.

If Davis had been unarmed, the agent and officers could have taken Davis into custody immediately. But because Davis had the gun, and officers knew him to be armed, it would have been dangerous for them to approach him. And the handgun "emboldened" Davis in resisting arrest. The Glock was loaded and operational. Davis knew the officers knew he had it because they had ordered him

to drop it. The gun's presence put the police on notice that he was armed and dangerous. The weapon made it easier for Davis to disregard direct police orders. Davis has a history of fleeing from police to avoid apprehension. Whether he is going 80 mph in a 35 mph zone or drawing a gun as he flees on foot, Davis has demonstrated again and again that the safety of others is of no concern to him.

### C. A two-level Enhancement under USSG § 3C1.2 is appropriate

United States Sentencing Guideline § 3C1.2 provides that "if the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by 2 levels." U.S.S.G. § 3C1.2. The Sentencing Guidelines explain that a defendant was "reckless" if he "was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4 cmt n. 1.

As he was being pursued by officers telling him to stop, Davis drew a loaded Glock from his sweatshirt and threw it into a room where an employee of the car wash was sitting. By doing so, Davis recklessly created a substantial risk of death or serious bodily injury to the employee in two ways. First, by fleeing with a firearm, Davis created a dangerous situation because the officers could have fired shots in response to observing Davis draw a gun while fleeing and disregarding

22

their commands. "Drawing a gun in front of officers," creating "a substantial risk that officers would open fire and perhaps injure other officers or bystanders," is a theory of reckless endangerment "supported by our caselaw." *United States v. Brooks*, 763 F. App'x 434, 440 (6th Cir. 2019); *see also United States v. Mukes*, 980 F.3d 526 (6th Cir. 2020). Because officers cannot "know whether a firearm is loaded or unloaded, pulling out any firearm in view of police officers while in flight creates a risk that officers might fire their weapons." *Id*. Based on the positioning of the employee in relation to Davis and the officers, it is a reasonable conclusion that he may have been caught in the line of fire.

Additionally, a Glock firearm is a "striker-fired" gun, so if it is loaded, it is "cocked." In *United States v. Howard*, the Sixth Circuit reiterated that the "risk created by throwing a cocked and loaded gun is obvious," because "when a person throws a loaded gun on the ground while running, the weapon [could] easily [be] discharged." *United States v. Howard*, 301 F. App'x 446, 448–49 (6th Cir. 2008). Even if the firearm was not discharged from the mere impact to the ground, which the safety features of the firearm may prevent, there is a real chance that the firearm trigger could catch on something—like a door handle or a drawer pull, and the firearm could discharge. The employee of the car wash was sitting feet away from where Davis tossed the gun. A real person was placed in real danger as a result of Davis's choices, and he should be held accountable for that.

23

### D. Nature and circumstances of the offense and history and characteristics of Dion Davis, 18 U.S.C. § 3553(a)(1)

When Dion Davis committed these crimes, he was not simply a prohibited person with one gun. Davis was a member of a violent street gang who advertised his possession of multiple firearms—including a fully automatic machine gun—on social media in an effort to promote the dangerousness of 700 Gang. On top of that, Davis was an unlawful user of controlled substances and was on pretrial release while he flaunted his possession of firearms for the world to see.

Davis is young. He turned 18 years old in December 2020. He has been under court supervision or in custody since June 25, 2020. While under supervision, Davis failed spectacularly at abiding by the conditions of bond. He was supervised out of Macomb County for on an incident where he possessed a firearm and fled from a vehicle that he was a passenger in after the driver of that vehicle struck a police officer and fled into another county. Davis was also supervised out of Wayne County after he fled from a police officer at a high rate of speed when the officer attempted to pull over the vehicle he was driving. The defendant was released on bond by each of those courts and was ordered to not possess any firearms, among other conditions. Despite the opportunity to remain free on bond, the defendant repeatedly violated the conditions by possessing and using a cache of dangerous firearms.

Death and destruction seem to follow Davis wherever he goes. Obviously,

24

Davis is a danger to the people he perceives as "opps" or gang rivals that he shoots at. But he is also a danger to the people living in the community where he is engaging in gang warfare. He is a danger to the police officers tasked with the responsibility of making those communities safer. He is a danger to his family; his mother's house being shot up and his sister being murdered did not dissuade him from being part of a gang—by his own social media posts, it seems to have only emboldened that association. And at this point, Davis is also a danger to himself.

Davis's history and characteristics weigh in favor of a top of the guideline sentence. Unfortunately, little in Davis's history could give the Court any confidence that when he is released, he will live a crime-free life. His history, dangerous affinity for firearms, and his association with the 700 Gang suggests the opposite.

E.      **Seriousness of the Offense, Adequate Deterrence, and Protecting the Public, 18 U.S.C. § 3553(a)(2)(B) and (C)**

The defendant, while on court supervision for multiple felony offenses involving weapons and fleeing from the police, continued to possess a cache of weapons and continued to use narcotics on a daily basis. These weapons included semi-automatic pistols, high-powered rifles equipped with 100-round drum magazines, and a handgun modified with a device designed to make it function as a fully automatic weapon. Not only did the defendant possess firearms, but he used them as well.

25

These are serious offenses, and the likelihood of Davis re-offending is high. According to a recent study by the United States Sentencing Commission, firearms offenders recidivate at significantly higher rates than offenders convicted of non-firearm offenses. *See* United States Sentencing Commission, Recidivism Among Federal Firearms Offenders, June 2019, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190627_Recidivism_Firearms.pdf. Over two-thirds of firearms offenders were re-arrested for a new crime within eight years of release. *Id*. at 2, 17-19. The recidivism rate of offenders—like Davis—under the age of 26 was 83.8 percent. *Id*. At 22. Davis's lack of education and future employment prospects certainly do not decrease his likelihood of recidivism.

It is clear Davis does not respect the law. Thus far, previous lenient juvenile sentences and community supervision have not deterred him from committing one offense after another. (PSR ¶¶ 39-41, 45-47). In this case, the seriousness of the offense is compounded by Davis's decision to commit it while on felony pretrial release in two counties. His apparent unfettered access to firearms and commitment to 700 Gang are significant concerns for the government. A substantial sentence is necessary to protect the public and deter Davis from committing more crimes upon his release.

26

**F.**     **Providing Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, 18 U.S.C. § 3553(a)(2)(D)**

According to the PSR, the defendant dropped out of school in the ninth grade. (PSR ¶¶ 66, 67). Because he does not have a high school diploma or a GED, he will be required to participate in the Bureau of Prisons Literacy Program (offered at all facilities). Since leaving school, Davis has struggled to maintain consistent employment. (PSR ¶ 69). He did not have any assets or verifiable income to report to probation. (PSR ¶ 70). In that regard, the defendant may benefit from Occupational Education Programs, designed to help inmates acquire marketable skills in a wide variety of trades.

BOP also offers a number of programs that are aimed at substance abuse and mental health treatment. One of those programs is the Bureau Rehabilitation and Values Enhancement Program ("BRAVE"). BRAVE is a cognitive-behavioral, residential treatment program for young males, serving their first federal sentence. BRAVE is a six-month program available to males less than 32 years old, serving sentences of at least 60 months. Davis reported using marijuana and prescription pills like Percocet prior to his arrest. (PSR ¶ 64). Federal facilities also offer both Residential Drug Treatment (RDAP) and Non-Residential Drug Treatment.

Davis may also benefit from the Federal Prison Industries Program, which seeks to help prepare inmates for successful reentry through job training.

27

## III.    Conclusion

The United States recommends a sentence of incarceration at the top of the

guidelines followed by a three-year term of supervised release.

Respectfully submitted,

DAWN N. ISON
United States Attorney

*/s Barbara K. Lanning*
BARBARA K. LANNING
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9103

Date: October 21, 2022                    barbara.lanning@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2022, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent a copy of the document via notification to:

Sanford Schulman

/s Barbara K. Lanning
BARBARA K. LANNING
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9103
barbara.lanning@usdoj.gov

29